

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:19-MJ-216 |
| CHAD EVERETT STEWART<br>a/k/a "Cal"<br>a/k/a "Fam" | **UNDER SEAL** |
| Defendant. | |

## AFFIDAVIT IN SUPPORT OF A
## CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Michael A. Fernald, being duly sworn, do hereby depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF") and have been so employed since 2014.  I am currently assigned to the Falls
Church II Field Office within the Washington Field Division.  Prior to my employment with
ATF, I was a sworn police officer in the Commonwealth of Virginia from 2003 to 2014 and
served in multiple capacities.

2.      During the course of my career, I have participated in the investigation of
narcotics traffickers.  Many of these investigations led to the arrest and conviction of these
traffickers and both their known and unknown co-conspirators.  In the course of conducting these
investigations, I have used several different kinds of investigative techniques, including:
interviewing informants and cooperating sources; conducting physical surveillance; conducting
short-term and long-term undercover operations, including reverse undercover operations;
consensual monitoring and recording of both telephonic and non-telephonic communications;

1

analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants, which have led to substantial seizures of narcotics, firearms, contraband, and drug related assets; and, the analysis of financial documents and records.

3.     This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4.     During the course of this investigation, law enforcement debriefed and used multiple cooperating defendants. Regardless of the cooperating defendants' genders, they will be referred to in the masculine gender. The cooperating defendants have been corroborated as detailed below, and have proven to be reliable and credible.

## PROBABLE CAUSE

### I.     Background on the Operation Tin Panda Investigation

5.     In March 2017, the ATF and the Federal Bureau of Investigation ("FBI") began jointly investigating the Imperial Gangsta Bloods ("IGB") and others within the Northern Virginia area and elsewhere. IGB members were known by law enforcement to be involved in narcotics distribution, firearms trafficking, home invasions, robberies, assaults, and homicides in Virginia, the District of Columbia, and Maryland.

6.      Through the course of this investigation, which is ongoing, law enforcement identified the source of the IGB's controlled substances.  Specifically, Cooperating Defendant 2 ("CD-2") supplied Cooperating Defendant 1 ("CD-1"), a high-ranking member of the IGB, with cocaine and heroin. CD-1 then provided it to other gang members for distribution.  CD-1, CD-2, and others were arrested beginning on December 5, 2017 and beyond, for their involvement in this conspiracy.

II.     **Coordinated Takedown on December 6, 2017**

7.      On December 6, 2017, over 300 law enforcement agents and officers executed a coordinated takedown as part of Operation Tin Panda. Law enforcement arrested 30 individuals that day and searched 14 residences. The following searches yielded evidence relevant to this complaint:

Search at 12905 Kerrydale Road, Woodbridge, Virginia

8.      On December 6, 2017, law enforcement executed a federal search warrant at 12905 Kerrydale Road, Woodbridge, Virginia. This address was the primary residence of Maurice JOHNSON at that time. JOHNSON was present at the location when the search warrant was executed.  Law enforcement located and seized four firearms, ammunition, and six cellular phones from the inside of the residence during the execution of the search warrant.

9.      One of the cell phones located within the residence was an Alcatel model 4060A bearing International Mobile Equipment Identity ("IMEI") 014699006650454. Two of the contact phone numbers featured Los Angeles area codes. The phone number (818) 310-6903 was stored under the name "FAM" ("STEWART Telephone Number 1") and the phone number (323) 338-9173 was stored under the name "CAL" ("STEWART Telephone Number 2").  CD-2

later provided information that "CAL" and "FAM" were aliases used by CD-2, CD-3, and

JOHNSON to refer to STEWART.

     10.    The Alcatel phone contained text message conversations between JOHNSON and

the above two numbers that are consistent with drug trafficking activity.

     a.    The text conversations discussed payment for product.  For example:

**July 24, 2017 – July 25, 2017**
    STEWART Telephone Number 2: "Hit me"
    STEWART Telephone Number 2: "It's short 500"
    JOHNSON: "What was it"
    STEWART Telephone Number 2: "29800"
    JOHNSON: "K"

**May 21, 2017 – May 22, 2017**
    STEWART Telephone Number 1: "He said these people new but the price going
        to change"
    STEWART Telephone Number 1: "The most he can do is 500 on the next go
        round"
    JOHSNON: "When r they ready"
    STEWART Telephone Number 1: "When ever you are"
    JOHNSON: "So they on deck"
    STEWART Telephone Number 1: "Yeah with that one you got"
    JOHNSON: "Yea u got 2 for me right"
    STEWART Telephone Number 1: "I didn't get that yet in my hands"
    JOHNSON: "Ok I'll call n 30"
    STEWART Telephone Number 1: "Ok cool"
    JOHNSON: "Can't call I'll call n the am if possible get up to 2 of them tomorrow
        for me"
    STEWART Telephone Number 1: "Not there yet"
    STEWART Telephone Number 1: "GOT TO BE TOMORROW"
    JOHNSON: "K"

     b.    The text messages also exchanged addresses for shipment of, and payment for,

controlled substances. For example:

**January 9, 2017 – January 10, 2017**
    STEWART Telephone Number 1: "Ok waiting on the rest"
    JOHSNON: "U have all our or no"
    STEWART Telephone Number 1: "Nah still one tied up on your end"
    JOHNSON: "Can u move with what u have"

STEWART Telephone Number 1: "My people's coming to see me I should be able"

JOHNSON: "Yea that's the plan I'll fix it if short out ASAP if u can"

STEWART Telephone Number 1: "I don't know if it's short haven't got the other math yet"

JOHNSON: "No with what you have now"

STEWART Telephone Number 1: "I'm checking this as we speak"

STEWART Telephone Number 1: "Waiting on them now but we should be good."

JOHNSON: "K"

JOHNSON: "I'll hit u n the am"

c.    The text messages also contained a series of numbers consistent with tracking numbers for shipments back and forth.  For example:

**December 15, 2016**

JOHNSON: "3458 macbain CT triangle VA 22172"

STEWART Telephone Number 1: "It won't be today fam."

JOHNSON: "Don't use that as then"

JOHNSON: "Ad"

STEWART Telephone Number 1: "Ok cool"

STEWART Telephone Number 1: "Give me a minute I'll call you"

**December 16, 2016**

JOHNSON: "14452 filerate St woodbridge 22193"

STEWART Telephone Number 1: Ok cool

**December 17, 2016**

STEWART Telephone Number 1: "9405809699939522372849"

JOHNSON: "K"

**December 19, 2016**

STEWART Telephone Number 1: "What's good"

JOHNSON: "U what's up"

STEWART Telephone Number 1: "Everything good"

JOHNSON: "TD thanks"

STEWART Telephone Number 1: "Cool"

11.    Law enforcement also recovered a Samsung Galaxy S4 bearing Android ID 351db02174559b82. This phone was registered to a phone number law enforcement had previously identified as belonging to CD-3.  The contact list on Samsung phone contained an entry for STEWART Telephone Number 2 under the name "CALF."

Search at 13715 Lynn Street, Woodbridge, Virginia

12.     Also on December 6, 2017, law enforcement executed a federal search warrant at 13715 Lynn Street, Woodbridge, Virginia. This residence was leased by a friend of CD-2 and utilized by CD-2 to store his controlled substances in. This included cocaine and heroin during this investigation. During this search, Law enforcement recovered approximately 1,014 grams of heroin. In addition to the heroin, law enforcement seized a "big bastard" kilogram press, a smaller press, two digital scales, suspected cutting material, and a food saver sealer and food saver bags. CD-2 later admitted that STEWART had sent him the heroin.

Search at 15144 Cloverdale Road, Woodbridge, Virginia

13.     Law enforcement also executed a federal search warrant at CD-2's primary residence, 15144 Cloverdale Road, Woodbridge, Virginia, and also executed a federal arrest warrant for CD-2. After arresting CD-2, law enforcement seized one firearm, assorted ammunition, 9 cellular phones, $12,580 in U.S. currency, an electronic money counter, and legal paperwork in CD-2's name. One of the cell phones recovered was an Apple iPhone Model A1660 bearing IMEI 355827085152947. The phone number was registered to one of CD-2's known phone numbers.

14.     Information stored within this phone showed that CD-2 used the phone to communicate with STEWART Telephone Number 2, CD-3, and JOHNSON regarding drug distribution related activity.

        a.     For example, on November 29, 2017, CD-2 sent CD-3 a text message stating, "fam said call him," "It's there." CD's identified "Fam" as a moniker for STEWART.

6

Search at 2750 Green Ash Loop, Apartment #404, Woodbridge, Virginia

15.     Finally, law enforcement executed a federal search warrant at 2750 Green Ash Loop Apartment #404, the primary residence of Cooperating Defendant 4 ("CD-4") and a location that CD-2 regularly visited. Within this location, law enforcement recovered one firearm, several hundred rounds of ammunition, 12 cellular phones, 3 digital scales, two 200mg calibrating weights, a food saver vacuum bag sealing device, packaging materials, 5.5 grams of cocaine, approximately 96 grams of THC edibles, and approximately $20,000 in U.S. currency.

16.     Law enforcement also forensically analyzed an Apple laptop computer seized at this residence. Data located on the computer revealed that the user visited websites used to track packages through FedEx and/or the USPS at least 99 times.  The Google Chrome user profile identified CD-4 as the user.

### III.     Information from Cooperating Defendant 2

17.     CD-2 was a six-time convicted felon, not including federal drug trafficking convictions for his involvement in this conspiracy.  On May 1, 2018, law enforcement interviewed CD-2. During the interview, CD-2 revealed that he, CD-3, and JOHNSON had been distributing multi-kilogram quantities of cocaine on a monthly basis since 2016.  CD-2 had also recently began receiving kilograms of heroin.  CD-2 stated the STEWART was the source of supply for both the cocaine and heroin.

18.     CD-2 explained that he was introduced to STEWART in early 2015 through an associate of JOHNSON.  CD-2 reported JOHNSON had a close friend, "BAMBOO" (known to law enforcement as KENNETH EARL HENRY) who was incarcerated at the time they were

introduced to STEWART. JOHNSON was still dealing with HENRY's son (known by law

enforcement to be KENDALL EARL HENRY ("Kendall") while he was incarcerated. CD-2

informed Kendall that he was looking for a source for drugs and Kendall introduced him to

STEWART. CD-2 reported he had visited STEWART in California on at least three occasions,

and STEWART has visited CD-2 in Virginia on at least one occasion.

19.     Law enforcement showed CD-2 a photograph of STEWART, and CD-2

confirmed his identity as the group's source of supply and who he referred to as "CAL" or

"FAM." CD-2 identified phone numbers within his own phone that he used to communicate

with STEWART regarding drug trafficking. CD-2 identified STEWART Telephone Number 2

and an additional number, 310-956-2734 (hereafter STEWART Telephone Number 3). Both

phone numbers have Los Angeles area codes, which is a known hub for cocaine distribution

within the United States because of its closer proximity to cocaine production areas outside of

the country.

20.     CD-2 stated that when he visited STEWART, he flew into Los Angeles, CA. CD-

2 stated STEWART lived approximately 15-20 minutes away from the airport, on Truro Avenue.

CD-2's phone contained the address 11888 Truro Avenue, Hawthorne, CA 90250, and CD-2

confirmed this is where STEWART lives.

21.     According to CD-2, he started out purchasing large quantities of marijuana from

STEWART before moving on to cocaine to achieve higher profit levels. CD-2 stated that when

he first began buying cocaine in early 2015, he purchased approximately 3-5 kilograms of

cocaine before breaking contact with STEWART for approximately five months to work with a

cheaper source of supply. Around the summer of 2015, CD-2 reinitiated contact with STEWART

and resumed purchasing controlled substances from him at the rate of two kilograms at a time,

working up to the rate of 5 kilograms at a time. CD-2 reported he would receive each kilogram

of cocaine purchased individually and would come inside of a book with a compartment cut into

it. STEWART would ship the cocaine via USPS, FedEx and UPS.

22.     In approximately late 2015, CD-2 introduced JOHNSON and CD-3 to

STEWART. They then began pooling their cash and jointly purchased large quantities of

marijuana from STEWART. In 2016, the partners began jointly purchasing cocaine from

STEWART instead. The co-conspirators pooled their money together in bulk shipments of U.S.

currency to STEWART, and in return, STEWART sent bulk shipments of cocaine to designated

addresses in the Northern Virginia area. CD-2 stated that STEWART required his customers to

order at least 5 kilograms of cocaine per month. CD-2 maintained this purchasing level, and CD-

3 and JOHNSON together also maintained this level of purchasing and distribution.

23.     CD-2 reported the group communicated with STEWART via cellular phones, to

include phone calls, FaceTime video calls, and text messages to order product and coordinate

shipments of U.S. currency and controlled substances.

24.     CD-2 stated that STEWART charged $25,000 per kilogram of cocaine if paid up

front, and $32,000 if purchased on consignment.

25.     CD-2 provided his cash to JOHNSON and/or CD-3. CD-2, CD-3, and

JOHNSON would then combine their cash and mail it to the Los Angeles area, where

STEWART was located. JOHNSON provided cash to invest in the business but tried to "keep his

hands clean" and stay out of the overt drug activity. CD-3, on the other hand, served as the

primary point of contact with STEWART, arranging outgoing shipments of cash and incoming

shipments of product through family members and other parties.

9

26.     CD-2 received packages in the mail from STEWART that contained individual kilograms concealed within a cut out portion of a large book. CD-2 explained that regardless of the quantity of kilograms he ordered, they would arrive one kilogram at a time, individually packaged in a book, through the USPS. CD-2's average profit was approximately $15,000 per kilogram.

27.     On one occasion, CD-4 flew to Los Angeles with $40,000 in U.S. currency to provide to CD-2 for the purchase kilograms of cocaine from STEWART in California.

28.     CD-2 also stated that CD-4 had his own customer base to whom he sold cocaine. CD-2 stated that CD-4 purchased an ounce of cocaine approximately 1-2 times a week from CD-2 for $1,100 per ounce. CD-2 additionally stated that on one occasion, CD-4 purchased 500 pills of 30mg Oxycodone tablets from CD-2, which CD-5 used and sold. CD-2 reported these pills were also sold for a profit. CD-2 further stated that these 500 pills came from a total shipment of 1,000 pills, which CD-2 purchased from STEWART for a price of approximately $7-$10 per pill.

## IV.     Information from Cooperating Defendant 1

29.     CD-1 has pleaded guilty to federal firearm and drug trafficking charges for his involvement in this conspiracy. On July 9, 2018, law enforcement interviewed CD-1. Law enforcement knows through previous investigation that CD-1 regularly purchased, and arranged third party purchases of, large amounts of cocaine and heroin from CD-2 for approximately nine months prior to the takedown on December 6, 2017.

30.     CD-1 stated that CD-2 was supplied with cocaine, marijuana, and heroin from an individual CD-2 met in California. CD-1 also met this individual. In 2016, CD-2 asked CD-1 to travel to California and deliver $30,000 to CD-2's source of supply. CD-2 flew to California and

met the individual at the airport. Law enforcement showed CD-1 a photograph of STEWART, and he positively identified STEWART as the individual to whom he delivered $30,000 on behalf of CD-2.

**V.      Information from Cooperating Defendant 3**

31.      CD-3 has a previous federal conviction for conspiracy to distribute cocaine base in Northern Virginia. CD-3 has also been convicted for his involvement in this conspiracy. At the time of his arrest on September 20, 2018, CD-3 waived his rights and spoke to law enforcement. His statements confirmed much of what CD-2 told law enforcement.

32.      CD-3 estimated he started distributing cocaine with CD-2 and JOHNSON in November 2016. CD-3's involvement in late 2016 was coordinating the shipment and receipt of packages through family members, their friends, and homes on the rental market or for sale. Those involved in picking up or shipping packages received $200 for their efforts.

33.      CD-3 reported that at most, the group would receive two packages at a time and each would go to a different address. No matter the packages, CD-3 arranged a different address for each package. The group initially used FedEx to receive the packages of drugs from STEWART, but later used USPS.

34.      CD-3 reported he sent packages of U.S. currency to STEWART in California using addresses that STEWART provided him. The amount of U.S. currency per shipment ranged from $20,000 to $130,000. CD-3 reported the average package contained $50,000, and he sent at least one package per month.

35.      CD-3 reported that on one occasion, he took a trip to California with CD-2, JOHNSON, and a family member of CD-2. CD-3 reported he had $10,000, and the others all separately carried money on the plane as well. CD-3 reported he met STEWART on this trip. A

11

photograph of STEWART was displayed to CD-3, he stated it looked like the source he met in California. The purpose of the trip was for CD-2 to pay STEWART. CD-2 was also hoping STEWART would introduce the group to a new source of supply. CD-2 wanted a better price or steadier stream of supply and asked STEWART to introduce him to a new source. Based on this, CD-3 believed STEWART was the intermediary to a "connect" (source of controlled substances).

36.     CD-3 reported he would communicate with STEWART on his phone, but reported he did not store STEWART as a contact and that the "burner" phone that he had used was thrown away by CD-3 after the December 6, 2017 law enforcement takedown targeting their operation. I know that a "burner" phone is a temporary phone used by drug traffickers and other criminals to attempt to conceal their identity as the subscriber in order to avoid detection by law enforcement.

37.     CD-3 reported he received a phone call from STEWART after the December 2017 takedown. STEWART was inquiring about CD-2's arrest and the law enforcement operation in general.

## VI.     Information from Cooperating Defendant 4

38.     CD-4 had no criminal history prior to pleading guilty to federal drug trafficking charges for his involvement in this conspiracy. On October 2, 2018, law enforcement interviewed CD-4.

39.     CD-4 has known CD-2 for approximately 4 years. During the first year, CD-4 observed CD-2 with marijuana, and further reported CD-2 would bring multiple pounds of marijuana to CD-4's apartment. CD-2 also had shipments of marijuana sent to CD-4's place of employment.

40.     In approximately March 2017, CD-4 learned CD-2 was getting shipments of cocaine. CD-4 reported the cocaine would be vacuum sealed, wrapped in a balloon and duct taped. Sometimes the cocaine would be inside a book. CD-2 would use CD-4's apartment to break down the cocaine into smaller amounts (4.5 ounce and 1 ounce quantities) after cutting the cocaine with Inositol. CD-4 would assist CD-2 and would also help count money.

41.     In approximately October 2017, CD-4 flew to California from Virginia and met CD-2. CD-2 had contacted CD-4 and instructed him to fly to California with cash. CD-4 rolled the cash into jeans and placed the jeans in his carry-on bag. CD-2 picked up CD-4 at Los Angeles International Airport and they travelled to an apartment building, where CD-2 met with a male and gave him the cash. CD-4 was shown a photograph of STEWART, and he believed it was the same person that CD-2 met. CD-4 reported they stayed in Hawthorne, CA.

## VII.     Information from Phones, Phone Records and Location Information

42.     Law enforcement reviewed telephone records from T-Mobile for STEWART Telephone Number 1. CD-3 contacted this number, which he had stored under the name "FAM," from August 13, 2016 to November 5, 2016. JOHNSON's Alcatel phone contacted Stewart Telephone Number 1 approximately 233 times.

43.     Law enforcement also reviewed telephone records from T-Mobile for STEWART Telephone Number 2. CD-2 and CD-3 contacted this number from August 7, 2017 to October 25, 2017. JOHNSON's Alcatel phone contacted STEWART Telephone Number 2 approximately 48 times.

44.     Law enforcement analyzed the location data provided by T-Mobile for STEWART Telephone Number 2 between July 25, 2018 and September 20, 2018 between the hours of 3:00 AM and 5:00 AM to determine where the user of the device is likely residing.

There were numerous pings in the area of 11893 Truro Avenue, Hawthorne, CA and 2100 East Katella Avenue, Anaheim, CA. During surveillance at the 11893 Truro Avenue address in October, 2018, law enforcement observed STEWART at the residence along with an Infiniti M35 parked that was registered to STEWART. In April, 2019, law enforcement observed a black Jeep parked at the 11893 Truro Avenue also registered to STEWART, but to the 2100 East Katella Avenue address.

45.     Law enforcement also reviewed telephone records from T-Mobile for STEWART Telephone Number 3. CD-2 stored this phone number under the name "CAL," and contacted the phone number from February 4, 2017 to December 5, 2017.

**VIII.   Information from Flight History**

46.     Law enforcement also obtained flight history records for the cooperating defendants.

47.     On December 1, 2016, CD-2, CD-3, JOHNSON, and a family member of CD-2 did in fact fly from Ronald Reagan Washington National Airport (DCA) to Los Angeles International Airport (LAX) on the same Alaska Airlines flight, corroborating CD-3's account.

48.     On April 27, 2017, STEWART travelled from Los Angeles International Airport to Washington Dulles International Airport, corroborating CD-2's statement that STEWART had visited him once.

**IX.   Law Enforcement Surveillance of Chad STEWART**

49.     On or about October 9, 2018, law enforcement observed STEWART sitting at the rear of the 11893 Truro Avenue building. Law enforcement also observed an Infiniti M35 bearing California registration 7GQJ807 parked at the building. A query of California's Department of Motor Vehicles revealed the vehicle is registered to Chad Everett STEWART.

14

50.     In addition, CD-2 was able to identify several photographs of 11893 Truro Avenue, Hawthorne California as STEWART's residence in California. He also positively identified the Infiniti M35 as belonging to STEWART.

51.     On or about April 24, 2019, law enforcement observed a black 2018 Jeep SUV parked in the same location as the above Infiniti. The vehicle was bearing CA registration 8EDR110 and returned to Chad Everett STEWART of 2100 East Katella Avenue #244, Anaheim, CA.

52.     Location history of STEWART's phone collected by law enforcement during this investigation showed STEWART frequenting both 11893 Truro Avenue, Hawthorne, CA and 2100 East Katella Avenue, Anaheim, CA. These locations are further corroborated as belonging to STEWART through law enforcement databases and utilities. visited him once.

## X.     Controlled Delivery of Cocaine in the Eastern District of Virginia

53.     On February 9, 2019, members of the Virginia State Police were conducting parcel interdiction at a UPS Facility in Fairfax County, Virginia. VSP identified a suspicious parcel and a narcotics canine was utilized to scan it, which yielded a positive alert to the presence of the odor of narcotics. VSP obtained a state search warrant for the parcel in Fairfax County, Virginia. Located inside the parcel was approximately 1295 grams of cocaine that was concealed inside a book with a hollowed out center. The cocaine was vacuumed sealed and taped. Law enforcement officers directly involved with this investigation field tested the substance inside the parcel, which tested positive for cocaine.

54.     Continuing on February 9, the VSP, Drug Enforcement Administration and Homeland Security Investigations conducted a controlled delivery, search warrant and reversal operation of the parcel at an address in Manassas, Virginia. Through their investigation, they

15

learned that a resident of the home was supposed to be paid to receive the parcel and provide it to

KENDALL HENRY. KENDALL would later arrive to pick up the parcel and kilogram of

cocaine along with his mother and a subject later identified by law enforcement as KENNETH

HENRY AKA BAMBOO.

55.     During the course of the above investigation, law enforcement reviewed

communications on KENDALL's phone. There was communications related to two parcels

shipped from California to the same Manassas residence. There was also a conversation between

KENDALL and his mother on or about December 29, 2018. His mother texted and said, "On my

way to airport." Kendall replied to his mother and said, "For what?" She replied, "LA."

KENDALL then texted her, "Didn't you say you coming back Tuesday?" She replied, "I'm

going to see Chad." Law enforcement believes that the conversation was in reference to

Kendall's mother flying to Los Angeles, California to visit STEWART, regarding the trafficking

and distribution of controlled substances.

56.     This belief was further corroborated when an Administrative Subpoena for

subscriber information and call data was issued for KENDALL's mother's (Maureen WISE)

phone number. Toll analysis conducted by DEA agents' revealed communication between her

and a telephone number, (323) 636-1670, believed to be used by STEWART. Law enforcement

conducted open source database searches that revealed that STEWART listed this same

telephone number as belonging to him. An Administrative Subpoena for subscriber information

and call data was issued for STEWART's suspected current phone number. Agents conducted

toll analysis and revealed STEWART's number is in communications with phone numbers used

by KENNETH HENRY AKA BAMBOO, KENDALL HENRY, and others known to be

involved in this ongoing conspiracy.

16

## XI.   Conclusion

57.     Based on the foregoing paragraphs, I submit there is probable cause to believe

that from early in 2015 to February, 2019, in the Eastern District of Virginia and elsewhere,

CHAD EVERETT STEWART conspired with CD-2, CD-3, JOHNSON, and others to distribute

five kilograms or more of a mixture and substance containing cocaine and at least one kilogram

of a mixture and substance containing heroin, in violation of Title 21, United States Code,

Sections 841(a)(1) and 846. I therefore, respectfully request that the court issue an arrest warrant

charging STEWART with these violations.

Respectfully submitted,

Michael Fernald
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

SUBSCRIBED and SWORN to before me on ___May 9___, 2019.

___/s/___
Ivan D. Davis
United States Magistrate Judge

17